IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARVIETTA H., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ANDREW M. SAUL, Commissioner ) <br> of Social Security, [1] ) <br> ) <br> Defendant. ) | No. 19 C 610 <br><br> Magistrate Judge Gabriel A. Fuentes |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Marvietta H.[3] applied for Disability Insurance Benefits ("DIB") on November 3, 2016, when she was 50 years old. (R. 222.) After a hearing, an administrative law judge ("ALJ") issued an opinion finding that Plaintiff was under a disability from August 8, 2015 to March 31, 2017, and not under a disability thereafter. (R. 16-28.) The Appeals Council denied review of the

---

[1]The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berryhill, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On February 20, 2019, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 10.) On May 31, 2019, this case was reassigned to this Court for all proceedings. (D.E. 14.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Id.* A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

ALJ's decision (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Plaintiff seeks remand of the Commissioner's decision denying her application for benefits after March 31, 2017 (D.E. 13), and the Commissioner has asked the Court to affirm the decision. (D.E. 22.) The matter is now fully briefed.

I.     ADMINISTRATIVE RECORD

    A.     Medical Evidence

On August 8, 2015, Plaintiff tripped on an uneven piece of concrete at Great America and fell, injuring her left shoulder and neck. (R. 399.) She visited orthopedist Nickolas Garbis at Loyola University Medical Center, who prescribed Norco (a narcotic), Flexeril (a muscle relaxant) and Tramadol (a narcotic) and gave Plaintiff several steroid injections in her neck and shoulder, which she reported did not alleviate her pain. (R. 350, 383, 386-87, 409.)[4] On September 16, 2015, Plaintiff had an MRI of her left shoulder which Dr. Garbis characterized as "essentially a non-displaced fracture and an MRI of her cervical spine," which revealed mild degenerative changes. (R. 352, 402.)

In November 2015, Plaintiff visited Advanced Physical Medicine pain management clinic and received facet joint injections into her cervical spine, which she reported alleviated 65 percent of her neck pain and 90 percent of her headaches. (R. 848.) She returned to the pain clinic in December 2015 again complaining of neck pain; Nereej Jain, M.D., diagnosed cervical facet syndrome and recommended another series of injections. (R. 848-49.) In January 2016, after a

---

[4] As described below, the record reflects that Plaintiff received a number of different types of injections for pain over the course of her treatment, including steroid injections, facet joint injections, cervical nerve block injections, and cervical medial branch radiofrequency ablation, which is a treatment that uses radio waves to heat and destroy a patient's nerve endings in an attempt to alleviate pain. It is not apparent from the treatment notes why a particular type of injection was prescribed at any particular time.

2

second MRI of Plaintiff's left shoulder, orthopedic surgeon Gregory Markarian, M.D., diagnosed Plaintiff with a tear in her rotator cuff. (R. 471, 479, 489-93). Dr. Markarian performed surgery to repair Plaintiff's left shoulder on April 14, 2016. (R. 460-61.)

After the surgery, Plaintiff continued to complain of neck and shoulder pain. She saw Dr. Markarian every month for post-surgery follow up but received the majority of her treatment through the pain clinic, where she underwent physical therapy three times per week and also was treated with cervical injections, overseen by Drs. Jain and Aleksandr Goldvekht, M.D. (R. 1059-78.) Between June and October 2016, Dr. Markarian noted that Plaintiff's range of motion was improving, except that in July he found that her scapular movement was impaired; he recommended she continue physical therapy. (R. 581, 599, 603.) During this same period, Plaintiff continued to complain of left shoulder pain and tenderness and neck pain that radiated into her arm; she continued to take prescription pain medication. (R. 854-59, 1059-78.)

In November 2016, Plaintiff had bilateral cervical nerve block injections at the pain clinic, and in December 2016, Dr. Jain gave her a cervical medial branch radiofrequency ablation, which she reported did not help her pain. (R. 856-60.) Dr. Markarian noted at an appointment a week later that Plaintiff had shoulder inflammation, so he decided to wait to give her another injection. (R. 672.) In January 2017, Dr. Jain prescribed a steroid and directed Plaintiff to continue to take prescription pain medications Naproxen and Flexeril as needed. (R. 861.) In February 2017, Plaintiff complained of pain in her right neck and left shoulder and Dr. Jain noted that the radiofrequency ablation had caused inflammation. (R. 862.) He recommended that Plaintiff have another cervical facet injection to treat her neck pain and that she follow up with Dr. Markarian regarding her shoulder.

Also in February 2017, Plaintiff was reevaluated for physical therapy and reported continued neck and shoulder pain, some of which she attributed to prior procedures. (R. 1082.)[5] On February 8, 2017, Plaintiff declined a subacromial injection[6] with Dr. Markarian, who ordered another month of physical therapy, and opined that after that, her shoulder would be "done" (R. 525.)[7] Plaintiff continued to complain of pain and in March 2017, after Plaintiff again declined a subacromial injection, Dr. Markarian recommended another MRI. (R. 1034.)[8]

In April 2017, after reviewing the MRI, Dr. Markarian noted that there was no evidence of a cartilage, ligament, or tendon tear and diagnosed Plaintiff with left shoulder tendinosis and again recommended a subacromial injection (R. 1001, 1007-08.) In June 2017, Dr. Markarian noted that Plaintiff had pain in the impingement arc (the tendons of the rotator cuff muscles) and a positive Hawkins' maneuver in her left shoulder.[9] (R. 1003.) He recommended a "Spinal Q" which Plaintiff agreed to wear.[10] (AR 1039.) In October 2017, Dr. Markarian ordered that Plaintiff undergo another MRI because her rotator cuff tendinosis had not improved. (R. 1030.)[11] That MRI showed a partial tear of one of Plaintiff's rotator cuff muscles and mild joint arthropathy. (R. 1710-11.) On January 31, 2018, Dr. Markarian noted that Plaintiff had a positive Hawkins maneuver. (R. 1028.)

---

[5] Plaintiff visited Loyola medical center in February 2017 for the purpose of "establishing care." (R. 560.) Medical records from that appointment do not indicate what type of doctors Plaintiff sought but describe the appointment as a "routine general medical examination." (R. 560-564.)

[6] A subacromial injection is an injection of a combination of steroid medication and anesthesia, performed under sterile conditions. It is a treatment for shoulder disorders including rotator cuff problems that is generally used when less invasive treatments have failed to alleviate pain. https://radiopaedia.org/articles/subacromial-bursal-injection?lang=us, *visited on* November 23, 2020.

[7] Dr. Markarian does not explain what would be "done" in another month, but Defendant implies that it refers to Plaintiff's shoulder recovery.

[8] Although Dr. Markarian's notes do not reflect Plaintiff's reasons for declining the subacromial injections, evidence described elsewhere in this opinion shows that they caused that they caused dizziness, headaches, and skin sensitivity on her neck.

[9] The Hawkins test evaluates a patient for rotator cuff disease and subacromial tendinosis; pain during the test indicates a positive result. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4935057/ *visited on* November 11, 2020.

[10] A Spinal Q is a prescription posture-correcting soft brace that is worn to treat back and neck pain. (R. 881.)

[11] Dr. Markarian's note incorrectly states that Plaintiff is "post right shoulder arthroscopy" instead of left. There is no evidence that this error is anything other than a transcription or similar mistake.

On February 28, 2018, Plaintiff complained again of tendinosis in her left shoulder and Dr. Markarian ordered that she undergo a functional capacity evaluation to determine her ability to work. (R. 1031.)

On April 17, 2018, Plaintiff visited a neurologist for treatment of headaches and pain and tenderness at the back of her neck which she described as "excruciating" whenever the area was touched and which she attributed to some of the injections she had previously received. (R. 1591.) Treatment notes state that Plaintiff described three headaches per month which did not bother her "too greatly." (*Id.*) On examination, the motor function of Plaintiff's left upper extremity showed guarded movement and she was unable to abduct her left arm. (R. 1593.) The neurologist was unable to reproduce Plaintiff's symptoms of "stinging and burning" under the skin on the back of her neck with a Spurling's test but described Plaintiff as being "excessively tender with any form of even slightest palpation over her skin." (R. 1594.)[12] The doctor recommended that Plaintiff begin taking Gabapentin and that she undergo an MRI of her cervical spine. (*Id.*)

### B. Hearing Testimony

At the hearing on May 16, 2018, Plaintiff testified that the surgery on her left shoulder had not alleviated her pain and that she had not been able to lift any weight with her left arm since her fall. (R. 41-42.) She was in constant pain on her left side but had stopped taking pain medication because it made her sleepy and disoriented, and she refused additional cervical injections because they caused other problems, such as headaches and dizziness. (R. 42-44.) Plaintiff had not yet begun taking prescribed Gabapentin at the time of the hearing because her neurologist had told her it could make her disoriented. (R. 46.) Plaintiff also testified that her orthopedic surgeon wanted

---

[12] Spurling's test is a non-invasive physical test to evaluate neck pain and determine the need for imaging and other diagnostic tools. It is designed to reproduce symptoms by compression of the affected nerve root. https://www.ncbi.nlm.nih.gov/books/NBK493152/ *visited on* November 20, 2020.

5

her to have a functional capacity evaluation performed but she could not afford the $800 it would cost her to have it done. (R. 54.) Although Plaintiff testified that she could reach her left hand out in front of her, she could only maintain the position, such as to type, for two to three minutes before she was in too much pain to continue, which her neurologist attributed to nerve damage. (R. 56.)

In response to a hypothetical from the ALJ for light work with occasional overhead reaching on the left side and frequent reaching forward with the left arm, the vocational expert ("VE") testified that the Plaintiff could not perform her previous work as a cook or home attendant, but available jobs included cafeteria attendant, marker, and photocopy machine operator. (R. 62-63.) When the ALJ added the additional limitation of occasional lifting to 10 pounds, the VE testified that the individual would be limited to sedentary work, and that given the Plaintiff's age, she would not be qualified to perform any of the available jobs. (R. 64.) Moreover, the VE testified that there would be no available jobs if Plaintiff was limited to only occasional reaching in any direction with her left arm. (R. 65.) Finally, the VE testified that there were no available jobs for an individual who would miss 15 percent or more of the workday because of his or her impairment. (R. 66.)

### C. ALJ Opinion

On August 13, 2018, the ALJ issued a written opinion finding that Plaintiff was under a disability within the meaning of the Social Security Act between August 8, 2015 and March 31, 2017, and that on April 1, 2017, she experienced medical improvement and was not disabled from that date forward. (R. 17.) At Step One, the ALJ found Plaintiff had not engaged in substantial gainful activity during this time period. (R. 20.) At Step Two, the ALJ found Plaintiff had the following severe impairments: rotator cuff tear of the left shoulder status post left shoulder surgery,

cervical facet syndrome with radiculopathy, and obesity. (*Id*.) At Step Three, the ALJ found Plaintiff's impairments did not meet or medically equal the severity of a listing. (R. 20-21.)

Next, the ALJ found that from August 8, 2015 through March 31, 2017, Plaintiff had the residual functional capacity ("RFC") to perform restricted light work as defined by 20 CFR 404.1567(b). (R. 21.) The ALJ found that Plaintiff could lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently. In an eight-hour workday, Plaintiff could stand/walk six hours and sit for six hours. The ALJ noted that Plaintiff was right-handed and opined she could occasionally perform overhead reaching with her left arm and frequently reach forward with her left arm and frequently perform handling and fingering with her upper left extremity. Due to pain and side effects of medication, Plaintiff would be off task for more than 15 percent of the work day and the ALJ found that for this reason, Plaintiff was disabled.

The ALJ summarized the medical evidence, noting that the cervical injection Plaintiff received in November 2015 provided 65 percent relief from neck pain and 90 percent relief from her headaches. (R. 22.) She described Plaintiff's continued complaints of neck pain after surgery and treatment for that pain through January 2017, including the November 2016 nerve block injection, two December 2016 cervical medial branch ablation procedures, and the prescription for steroids to treat her neck pain in January 2017. (R. 23.)

The ALJ noted that Plaintiff refused Dr. Markarian's suggestion that she have additional injections in February and March 2017 and that an MRI in March 2017 revealed an intact left rotator cuff with mild supraspinatus tendinosis and mild bone marrow edema (R. 23.) The ALJ also mentions that at an appointment in February 2017, when Plaintiff was establishing care with a new doctor, she denied joint aches and had a normal physical examination. (*Id.*)

According to the ALJ, evidence received at the hearing level showed that Plaintiff had postural and manipulative restrictions and would be off-task more than 15 percent of the day from August 8, 2015 through March 2017, preventing her from performing any jobs during the closed period between August 8, 2015 and March 31, 2017 and thus was disabled. (R. 23-25.)

Next, the ALJ went through the eight-step process for determining if medical improvement had occurred. 20 C.F.R. § 404.1595. Relevant to our analysis, at Step Three, the ALJ determined that medical improvement had occurred for Plaintiff, and at Step Four, the ALJ determined that this improvement was related to Plaintiff's ability to work. In making this determination, the ALJ described several of Plaintiff's medical appointments in June, September and October 2017 that were unrelated to her left shoulder impairment, the December 2017 MRI of Plaintiff's left shoulder revealing a low-grade articular surface tear and mild acromioclavicular joint arthropathy, and Plaintiff's report in April 2018 that she had three headaches per month which did not bother her "too greatly." (R. 26.)

The ALJ acknowledged Plaintiff's testimony that her rotator cuff surgery had not helped her pain and that she had stopped other pain treatments because they caused headaches. (*Id.*) The ALJ repeated her earlier statement that Dr. Markarian had noted consistent improvement after Plaintiff's shoulder surgery and that after her first neck injection Plaintiff reported 65 percent relief from neck pain and 90 percent relief from headaches. (*Id.*) Finally, the ALJ noted that Plaintiff testified that she could lift 40 to 50 pounds with her dominant right arm and that she had adjusted the RFC for incapacity on the left. *(Id.)*

The ALJ opined that Plaintiff's medical improvement related to her ability to work, finding that Plaintiff's RFC increased because pain no longer caused her to be off-task more than 15 percent of the day. Therefore, at Step 7, the ALJ found that as of April 1, 2017, Plaintiff had the

8

RFC to perform restricted light work as defined in 20 CFR 404.1567(b), which included the ability to lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently, to stand/walk for six hours and sit for six hours in an eight-hour work day, to occasionally reach overhead with left arm, frequently reach forward with her left arm and frequently perform handling and fingering with her upper left extremity. (R. 27.)

## II. ANALYSIS

### A. The Court Applies a Deferential Standard of Review.

The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "The ALJ's decision will be upheld if supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk*, 923 F.3d at 496 (internal citations and quotations omitted). "An ALJ need not address every piece of evidence, but he must establish a logical connection between the evidence and his conclusion," *i.e.*, "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). "Where substantial evidence supports the ALJ's disability determination, we must affirm the decision even if reasonable minds could differ concerning whether the claimant is disabled." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (internal citations and quotations omitted).

Before limiting benefits to a closed period, an ALJ must conclude either that a claimant experienced "medical improvement" as evidenced by changes in the symptoms, signs, or test results associated with her impairments, or else that an exception to this rule applies. *See* 20 C.F.R. §§ 404.1594(a), (b)(1); *Tumminaro v. Astrue*, 671 F.3d 629, 633 (7th Cir. 2011). When, as here, the ALJ finds the claimant disabled for a closed period in the same decision in which she finds

9

medical improvement, the severity of the claimant's current medical condition is compared to the severity of the condition as of the disability onset date. *Wofford v. Berryhill,* No. 16 C 4185, 2017 WL 1833186, at *4 (N.D. Ill. May 8, 2017). In this case, the ALJ found that Plaintiff experienced medical improvement and thus was no longer disabled as of April 1, 2017. Because we find that the ALJ did not adequately support her determination that Plaintiff experienced medical improvement, we remand the case.

### B.     The ALJ Ignored Evidence That Plaintiff Did Not Experience Medical Improvement.

The ALJ found that through March 31, 2017, Plaintiff was unable to work because pain in her left shoulder and side effects from medication would cause her to be off-task more than 15 percent of the work day, and that as of April 1, 2017, Plaintiff's pain and side effects would not cause her to be off-task for 15 percent of the work day, and thus, she was no longer disabled. There are gaps in the ALJ's reasoning that prevent us from understanding how she arrived at her determinations that Plaintiff experienced medical improvement significant enough to allow her to be on-task for 85 percent of the work day, and that such a level of medical improvement occurred on April 1, 2017.

The ALJ's opinion that Plaintiff would be off work because of pain and side effects for at least 15 percent of the work day until March 31, 2017, but not thereafter, that fails to account for the evidence that Plaintiff's pain and side effects were increasing in the months preceding that date and then continued afterwards, including to a level Plaintiff described as "excruciating."[13] Although she does not say so explicitly, the ALJ appears to rely on Plaintiff's March 2017 MRI –

---

[13] Although we do not reach Plaintiff's argument that the ALJ's RFC as a whole is inadequately supported, we note that the ALJ does not explain how she determined that Plaintiff would be off-task due to pain for at least 15 percent of the workday until March 31, 2017. Absent an understanding about how the ALJ calculated how much time Plaintiff would be *off task*, we cannot determine what metric the ALJ used to decide that as of April 1, 2017, Plaintiff would no longer miss 15 percent of the work day.

which showed no current tear in her rotator cuff – as evidence that Plaintiff had experienced medical improvement. But that is not evidence that Plaintiff was no longer experiencing serious and ongoing pain. Indeed, "the Administration's own regulation states that 'an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.'" *Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015) (quoting SSR 96-7p(4)).

Notably, the evidence shows that Plaintiff continued to visit the pain clinic with complaints of neck and shoulder pain, that she continued to be prescribed Naproxen and Flexil, and that Dr. Jain added a prescription steroid in January 2017. Plaintiff also complained of pain in February 2017, which both Dr. Jain and Dr. Markarian wanted to treat with different types of injections. The fact that Plaintiff declined at least some of these injections because of concerns of the side effects does not diminish the fact that two different doctors evaluated Plaintiff's pain as severe enough to warrant them as a treatment option.

Nor does Dr. Markarian's opinion in February 2017 that Plaintiff would be "done" after another month of physical therapy contradict Plaintiff's allegations of pain; indeed, in March 2017 Plaintiff was still complaining of pain and Dr. Markarian ordered an MRI. In April, June, and October 2017, Dr. Markarian continued to treat Plaintiff for shoulder pain, and a December 2017 MRI revealed another tear in Plaintiff's rotator cuff – a condition the ALJ mentions in passing but does not analyze. Moreover, in January 2018, Plaintiff had another positive Hawkins' test – which the ALJ does not mention in her opinion – and the following month Dr. Markarian ordered that Plaintiff undergo a functional capacity evaluation to determine her ability to work.

The ALJ's determination that Plaintiff's disability ended because she would no longer be off work because of pain is belied by the evidence of continuing pain, which the ALJ does not address. The fact that the ALJ summarizes – but does not evaluate the effects of – some of Plaintiff's complaints is not enough to build a logical bridge from the evidence to the conclusion that Plaintiff showed medical improvement. A mere summary is not the same as meaningful analysis. *See Chuk v. Colvin*, No. 14 C 2525, 2015 WL 6687557, at *7 (N.D. Ill. Oct. 30, 2015) ("[S]ummarizing a medical history is not the same thing as analyzing it, in order to build a logical bridge from evidence to conclusion.").

### C. The ALJ's Analysis of Plaintiff's Side Effects Was Flawed.

Next, with respect to the ALJ's determination that Plaintiff's time off work was also due to side effects from medication, the ALJ does not identify which side effects caused Plaintiff to be off-task for 15 percent of the work day or when and how these side effects improved. In fact, the evidence shows to the contrary, that Plaintiff's side effects from treatment actually worsened over time, particularly those that stemmed from the various cervical and other injections she received, and that such side effects were sometimes severe enough to prevent Plaintiff from undergoing additional pain treatments.[14] The ALJ found that Plaintiff would be off-task because of both pain and side effects, and her not having adequately addressed both factors in her determination that Plaintiff showed medical improvement also compels us to remand the case.

---

[14] We note, for example, that the ALJ relies on Plaintiff's statement to a neurologist in April 2018 that her headaches did not bother her "too greatly" to support her contention that Plaintiff was medically improved. But this determination ignores Plaintiff's testimony that she had been refusing additional injections because they caused side effects – including headaches – and also that the neurologist found Plaintiff to have severe sensitivity at the back of her neck, likely from previous procedures. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

### D. The ALJ Did Not Adequately Compare Plaintiff's Impairment From Injury to Improvement.

Finally, to the extent that the ALJ compared Plaintiff's impairment at the time of her onset date to the date she found Plaintiff experienced medical improvement, that analysis was inadequate. Twice in her opinion, the ALJ points to the relief Plaintiff obtained in November 2015 from cervical injections as evidence of improvement. But these injections occurred nearly five months before Plaintiff's rotator cuff surgery and almost 18 months before the date the ALJ found Plaintiff to be medically improved; clearly any relief or improvement she experienced from these injections was not permanent or otherwise alleviated Plaintiff's need for additional and substantial treatment. And the surgery itself did not result in medical improvement; the ALJ found that Plaintiff's disability continued for nearly a full year after Dr. Markarian repaired her rotator cuff. Moreover, by December 2017, Plaintiff's MRI revealed that she again – or still – had a tear in her rotator cuff, a development the ALJ did not address. The evidence shows that Plaintiff continued to experience significant pain resulting from her injury well past the April 1, 2017 date that the ALJ stated showed medical improvement.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted (R. 13), and the Commissioner's motion is denied. (R. 22.) It is so ordered.

**ENTER:**

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: December 28, 2020**